**CITY NATIONAL BANK OF FORT SMITH, Appellee,**

v.

**UNIQUE STRUCTURES, INC., Susie Arnall, and Henry O. Arnall, Jr., Appellants.**

No. 89–2724.

United States Court of Appeals, Eighth Circuit.

Submitted Sept. 13, 1990.

Decided April 9, 1991.

Rex M. Terry, Fort Smith, Ark., for appellants.

Michael K. Redd, Fort Smith, Ark., for appellee.

Before FAGG and BEAM, Circuit Judges, and ROY,* Senior District Judge.

BEAM, Circuit Judge.

The appellants, Susie Arnall and Henry O. Arnall, Jr., at the time of the events giving rise to this lawsuit, were in the business of selling mobile homes at retail in Poteau, Oklahoma. They incorporated their business as Unique Structures, Inc. The appellee, City National Bank of Fort Smith, Arkansas, under a dealer agreement with Unique, purchased some customer sales contracts. After many of these customers failed to make their monthly installments and after Unique and the Arnalls failed under their dealer agreement and personal guarantees to pay the balance due, City National filed this lawsuit. The bank sought a deficiency judgment on those loans for which the collateral had been repossessed and sold and the balance due on those loans for which the collateral had not been sold. Unique and the Arnalls now appeal the judgment of the district court in favor of City National. Jurisdiction is based upon diversity of citizenship.

Unique and the Arnalls argue (1) that whether notice of sale of collateral is reasonable is a question of fact for the jury under Arkansas law, (2) that the notices sent by City National did not meet the requirements of Arkansas law, (3) that there is insufficient evidence to support the jury's verdict, (4) that the jury's award was excessive, (5) that the district court erred in granting City National's motion for a directed verdict on their counterclaim for tortious interference with a contract, and (6) that the district court erred in granting attorney's fees to City National. We affirm.

## I. BACKGROUND

In March 1987, Unique, as indicated, entered into a dealer agreement with City National. Under the terms of this contract, City National agreed to purchase Unique's consumer installment contracts for mobile homes, provided the mobile home purchasers were creditworthy and the installment contracts were otherwise acceptable to City National. According to the dealer agreement, the contracts were purchased by City National with recourse—that is, Unique remained liable to City National in the event a mobile home purchaser defaulted. In addition to Unique's dealer agreement with City National, the Arnalls each personally guaranteed the obligations of Unique so that if a purchaser of a mobile home defaulted on his or her installment contract the Arnalls would individually be responsible to City National for any balance due or any deficiency remaining upon the sale of the collateral (i.e., the mobile home).

Following a number of defaults by customers, City National, in September 1988, exercised its option under the dealer agreement to demand immediate payment for all contracts in default. The following month, after Unique and the Arnalls had failed to pay, City National declared the entire dealer agreement to be in default and filed this

---

* The HONORABLE ELSIJANE TRIMBLE ROY, Senior United States District Judge for the Eastern and Western Districts of Arkansas, sitting by designation.

lawsuit. By the date of trial, in August 1989, fifty-eight customer loans, which had been purchased by City National pursuant to the dealer agreement, were in default. Some of the collateral for these fifty-eight loans had been repossessed and privately sold by City National. The remainder of the mobile homes had either not yet been repossessed by the time of trial or were repossessed but not yet sold.

Unique and the Arnalls argued at trial, among other points, that the notices of sale of the collateral failed to meet the requirements of Arkansas law and that the bank's disposition of the collateral was not commercially reasonable. The Arnalls argued further that City National had, prior to the lawsuit, released them from personal liability. In addition, Unique and the Arnalls filed counterclaims against City National, including an allegation that the bank had tortiously interfered with a contractual relationship between Unique and its employee, Stephen Post.

The district court granted City National's motion for a directed verdict on all the counterclaims. The district court also ruled as a matter of law that the notices for private sale of the collateral provided reasonable notification. The jury, in turn, awarded $710,000 in damages to City National, to be paid jointly and severally by Unique and the Arnalls. Following trial, the district court awarded City National $50,499 in attorney's fees.

## II. DISCUSSION

### A. Reasonableness of Notice as a Matter for Directed Verdict

■ Some of the mobile homes repossessed by City National, as noted above, were sold privately prior to trial. Arkansas Code section 4–9–504(3), an enactment of a provision of the Uniform Commercial Code, requires that a secured party send "reasonable notification" to a debtor "of the time after which any private sale [of

collateral] ... is to be made."[1] Ark.Code Ann. § 4–9–504(3) (1987). Notices of the sale of this collateral were sent by City National to Unique and the Arnalls. The district court, upon City National's motion for a directed verdict, ruled that these notices were reasonable as a matter of law. Unique and the Arnalls argue, however, that under Arkansas law whether the notices were reasonable or not is *always* a question of fact for the jury. They contend that the Arkansas Supreme Court established this rule in *Baber v. Williams Ford Co.,* 239 Ark. 1054, 396 S.W.2d 302 (1965). We disagree.

*Baber* involved an action by an automobile dealer (Williams) to recover a deficiency against a buyer of an automobile (Baber) on a contract for sale. Testimony at trial revealed that following the sale of the automobile to Baber, Williams transferred the note and contract for sale to the Ford Motor Credit Company. After Baber failed to make payments, the automobile was repossessed by the credit company and returned to Williams, with a demand that Williams repay the amount it had received on the transfer of the note and contract for sale. At this point—before Williams itself had the legal right to sell the car—Williams sent a letter to Baber providing him with a seven-day notice of private sale of the collateral. In reversing the trial court's decision directing a verdict for the dealer, the Arkansas Supreme Court stated:

> We think, *under the situation here existing,* the question of whether the letter ... was reasonable notice was a question for the jury to decide. The letter ... shows that Williams had not then repaid the Ford Motor Credit Company, so was not in full possession of the car with right to sell. Not until Williams reacquired the paper from Ford, would Williams have had the right to sell the car.

*Baber,* 396 S.W.2d at 304 (emphasis added). *Baber,* therefore, *did* present an instance

---

1. The Arkansas Court of Appeals stated in *Jones v. Union Motor Co.,* 29 Ark.App. 166, 779 S.W.2d 537 (1989), that " '[t]he purpose of notice is to give the debtor an opportunity either to discharge the debt and redeem the collateral, to produce another purchaser or to see that the sale is conducted in a commercially reasonable manner.' " *Jones,* 779 S.W.2d at 541 (quoting J. White & R. Summers, *Uniform Commercial Code,* § 27–12, at 600–01 (3d ed. 1988)).

in which the reasonableness of the notice was a question of fact for the jury. But *Baber* did not hold that the reasonableness of notice is *always* a question for the jury. We believe that the Arkansas Supreme Court decided the case as it did because the secured party (Williams) did not have the right to sell the collateral at the time of notice—a peculiar fact which does not exist in the present case.[2]

### B. Sufficiency of the Notices

Unique and the Arnalls raise at least two objections with respect to the merits of the district court's ruling that the bank provided reasonable notification of sale as a matter of law. They argue that the notices did not contain all of the information required by Arkansas case law, and that in some instances notice either was not sent or the sale occurred before the date provided on the notice as the time after which a sale would occur. We again disagree with appellants.

██ Our standard of review for either the grant or denial of a motion for directed verdict is the same standard that governs the district court in its consideration of the motion. Accordingly, we must

> (1) resolve direct factual conflicts in favor of the nonmovant, (2) assume as true all facts supporting the nonmovant which the evidence tended to prove, (3) give the nonmovant the benefit of all reasonable inferences, and (4) deny the motion if the evidence so viewed would allow reasonable jurors to differ as to the conclusions that could be drawn.

*Dace v. ACF Indus.*, 722 F.2d 374, 375 (8th Cir.1983). "The trial court has not erred [in denying a motion] if there is substantial evidence—more than a mere scintilla of evidence—to support a verdict in favor of the party opposing such a motion." *Jackson v. Prudential Ins. Co. of America*, 736 F.2d 450, 453 (8th Cir.1984).[3]

First, as indicated, Unique and the Arnalls argue that the notices sent by City National did not contain all of the information required by Arkansas law. More specifically, they contend that the Arkansas Supreme Court, in *Brown v. Ford*, 280 Ark. 261, 658 S.W.2d 355 (1983), established that a notice for private sale must, at a minimum, (1) advise the debtor that the collateral will be sold any time after ten days, (2) advise the debtor of the location of the collateral, and (3) advise the debtor that a deficiency will be claimed if the collateral sells for less than the amount of the indebtedness. Brief for Appellants at 27–28. According to Unique and the Arnalls, the notices sent by City National were not sufficient as a matter of law because the latter two points were not included in the notices.

██ We are convinced, however, that the notices sent by City National are sufficient under Arkansas law. Arkansas Code section 4–9–504(3) only requires a secured party to send "reasonable notification" to the debtor "of the time after which any private sale [of collateral] ... is to be made." Ark.Code Ann. § 4–9–504(3) (1987). "Reasonable notification" is not defined in the Arkansas statute, but this provision "adopts a minimalist approach." *Jones v. Union Motor Co.*, 29 Ark.App. 166, 779 S.W.2d 537, 541 (1989) (quoting J. White & R. Summers, *Uniform Commercial Code*, § 27–12, at 600–01 (3d ed. 1988)) (holding that notice need not expressly use the term

---

2. This conclusion is also supported, by implication, from the *Baber* court's distinction of its then recent decision in *Hudspeth Motors v. Wilkinson*, 238 Ark. 410, 382 S.W.2d 191 (1964), *rev'd on other grounds, Stimson Tractor Co. v. Heflin*, 257 Ark. 263, 516 S.W.2d 379 (1974). The *Baber* court noted that in *Hudspeth* it "had no hesitancy in saying that the notice ... was sufficient as a matter of law." *Baber*, 396 S.W.2d at 305. The implication of this statement is that a notice may be sufficient as a matter of law, as it was in *Hudspeth*.

3. The federal test employs essentially the same principles as Arkansas's test. *See Brown v. Cooper Clinic, P.A.*, 734 F.2d 1298, 1302 (8th Cir. 1984); *Marshall v. Humble Oil & Refining Co.*, 459 F.2d 355, 358–59 (8th Cir.1972). Thus there is no need to address the question—apparently as of yet unsettled in this circuit—of whether the appropriate standard of review should be based on federal law or state law. *See, e.g., Crues v. KFC Corp.*, 729 F.2d 1145, 1148 n. 1 (8th Cir.1984) (declined to reach issue because federal standard and Missouri standard are the same).

"private sale"). The Arkansas Court of Appeals has stated that *"only* reasonable notification of the time after which a private sale will be made is required." *Id.* (emphasis added); *see also Anglin v. Chrysler Credit Corp.,* 27 Ark.App. 173, 768 S.W.2d 44, 45–46 (1989) (distinguishing statutory requirements for public and private sale notices).[4] According to our review, the notices sent by City National did provide reasonable notice of the time after which the private sale of the collateral would be made. The notices sent by City National, in fact, were thorough and clearly worded and provided, in most instances, at least two weeks notice of the date after which the collateral would be sold.

We believe that Unique and the Arnalls misconstrue the Arkansas Supreme Court's decision in *Brown.* It is true that the Arkansas Supreme Court described the notice involved in *Brown* as containing the three points which the appellants now contend are essential to every notice. But whether these points were necessary to constitute reasonable notice was not an issue in the case. The Arkansas court simply described that particular notice for the purpose of stating the facts of the case. The court did not establish requirements beyond the statutory language.[5]

The second argument questions whether any notice was ever sent before the time of the sale of certain collateral. Unique and the Arnalls make the general assertion in their brief that there were "many sales [of collateral] for which no notice whatsoever was given" and "in no case did ... Mr. and Mrs. Arnall, as alleged guarantors, receive proper notice of the place, time and terms of any proposed sale as to any mobile home." Brief for Appellants at 26. In their reply brief, the appellants point to a

few examples of sales of mobile homes which they contend support this assertion. The appellants argue further that in at least one specific instance (and others not listed) the sale of the collateral occurred before the date stated on the notice as the time after which the sale was to occur. Reply Brief for Appellants at 2–3.

■ Our review of the record discloses that this is the first time these points have been raised. The only focus of inquiry and objection at trial related to the content of the notice. *See, e.g.,* Trial Transcript, vol. II, at 258–59 (attorney for appellants conceding during consideration of motion for directed verdict that their only objection related to the requisite contents of the notice). We find no record of any such discussion or objection at trial along the lines stated above and these points were not included in the motions for a new trial. In fact, until the filing of their reply brief, the appellants do not even provide any examples from the record to support the assertion in their initial brief. The arguments, therefore, come too late. It is a well-settled rule that "[w]ithout an objection and a proper request for relief, the matter is waived and will receive no consideration on appeal absent plain error." *Owen v. Patton,* 925 F.2d 1111, 1115 (8th Cir.1991). This is not a case of plain error.

■ Moreover, after reviewing the examples cited by the appellants in their reply brief we do not agree that deficiency judgments were obtained by City National when notice was not provided prior to sale of the collateral. City National presented two exhibits at trial that contained all demonstrative evidence of notice. Plaintiff's Exhibit 8, a bundle of photocopied documents, contained copies of some notices

---

4. A notice, of course, must include *some* information in addition to the date after which the private sale will be made. If the notice did not include any other information, it would probably be *incomprehensible* by the recipient. One commentator, for instance, has stated, "It would appear that the name of the creditor is essential as an anonymous notification of sale can not be regarded as reasonable notification." 9 R. Anderson, *Uniform Commercial Code* § 9–504:48, at 751 (3d ed. 1985). The points

which the appellants claim are required in the notice, however, are not of this essential nature.

5. Unique and the Arnalls also cite a number of cases in jurisdictions other than Arkansas which they contend support their point. All of the cases, however, involve notices that either contained erroneous and misleading information or otherwise frustrated the purpose of notice. Because none of these conditions exist in the present case, the decisi⌐ ↑ are not relevant.

and other important documents necessary to City National's lawsuit. Plaintiff's Exhibit 9 contained—according to the testimony of an officer for the bank—copies of all the notices provided by City National. Between these two exhibits, there is substantial evidence that notice was sent to Unique, Susie Arnall, and Henry Arnall before each sale of collateral. Postal return receipts are attached to many of the copies of notices and some of the receipts have the Arnalls' signatures. Furthermore, the argument that the collateral was sold after notice but before the date announced on the notice is more properly related to the question of commercial reasonability. The jury decided which of the various sales of mobile homes were commercially reasonable and obviously made exception for some sales when it awarded City National $710,000 instead of the $946,000 set forth in the exhibits and requested at trial.

## C. Sufficiency of the Evidence

 Unique and the Arnalls also argue that the jury's verdict is unsupported by the evidence. This being a diversity case, we generally apply the same standard, on review of the jury's verdict, as used by the state in which the district court sits. *Bastow v. General Motors Corp.*, 844 F.2d 506, 508 (8th Cir.1988). The test under the law of Arkansas, in any event, is similar to the federal test. *DeWitt v. Brown*, 669 F.2d 516, 523 (8th Cir.1982). As we noted in another recent diversity case applying Arkansas law, "we must view the evidence in the light most favorable to the verdict and determine 'whether there is substantial evidence to support the jury verdict.' *Weber v. Bailey*, 302 Ark. 175, 176, 787 S.W.2d 690, 691 (1990). We must give 'the verdict the benefit of all reasonable inferences permissible under the proof.' *Schaeffer v. McGhee*, 286 Ark. 113, 114, 689 S.W.2d 537, 538 (1985)." *Yel-*

*dell v. Tutt*, 913 F.2d 533, 540 (8th Cir. 1990). We hold that the jury's verdict is supported by the evidence. We limit this discussion to one point which seems to be of particular concern to the appellants.

 This contention relates to the state or condition of Plaintiff's Exhibit 8 and the way in which this important piece of evidence was presented in court. Exhibit 8, as mentioned above, contained most of the documents City National needed to support its claim: copies of promissory notes, appraisals, notices of sale, settlement sheets, etc. The documents pertaining to each mobile home were kept together in the exhibit, but the entire collection of documents—for all fifty-eight mobile homes—was bound together in a nearly two-inch thick bundle, with no index or table of contents or page numbers.[6] The appellants argue that the condition of this exhibit is "hopelessly misleading, garbled and contradictory," and that its confusion was compounded by the manner in which the district judge required the attorney for City National to rush through and summarize its contents. Brief for Appellants at 17–20. The appellants thus contend that the condition of the exhibit and the way in which it was presented did not provide sufficient evidence from which the jury could properly determine the actual damages.

We are mindful of the pressing dockets of the district courts, the discretion district court judges have with respect to the evidence received, and the demands on a trial judge's time. But we also are sympathetic to the appellants' concerns. From our reading of the transcript, the attorney for City National—to his credit—wanted to present the evidence in Exhibit 8 in a more systematic fashion, attempting to explain the amount owing on each customer's loan. *See* Trial Transcript, vol. I, at 30. This was not permitted. Nor was there, in our view, sufficient leeway granted in the cross-examination of the bank officer. *See id.* at

---

**6.** The exhibit, however, did include four summary sheets which provided an accounting of the principal, interest, legal and repossession expenses, etc. for each loan. Two of the summary sheets contain information on the loans as of July 10, 1989, and the other two sheets pro-

vide information as of August 14, 1989. A series of calculations, totalling the damages claimed by City National, are handwritten at the end of each of the two summaries. The summary sheets are both handwritten and computer-generated.

78. Exhibit 8 was rightly characterized by the district court in conference as a "haystack" of documents. *Id.* at 42. It should have been presented and received in a more careful and methodical way, especially given its importance to the case. Nonetheless, after our review of the record, we conclude that there was sufficient evidence to support the jury's verdict.

### D. Amount of Jury Verdict

█ Unique and the Arnalls also argue that the jury verdict in the amount of $710,000 is "grossly excessive." This issue was properly raised in the motions for a new trial, so it is now properly before us on appeal. *See DeWitt v. Brown,* 669 F.2d 516, 524 (8th Cir.1982). The question of excessiveness, however, is one best left to the district court and our standard of review is to determine whether the damages award is "shocking," "monstrous," or constitutes a "plain injustice." *Iowa–Mo Enter. v. Avren,* 639 F.2d 443, 452 (8th Cir. 1981). As noted above, the jury, in its verdict, stopped well short of the full amount of damages that City National showed and requested. The jury's award is, therefore, supported by the evidence and is not excessive.

### E. Counterclaim for Tortious Interference

Unique and the Arnalls filed a counterclaim against City National alleging that the bank tortiously interfered with the employment relationship between Unique and its salesman and general manager, Stephen Post. The district court granted City National's motion for directed verdict on the counterclaim and the appellants argue that the ruling should be reversed. We disagree.

The act or manner of interference, according to Unique and the Arnalls, was not an independent tortious act, but instead took the form of two banking agreements between City National and Post, while Post was employed by Unique. In August 1986, Post borrowed $86,000 from City National to finance the purchase of four mobile homes and a mobile home park. And, in February 1987, Post entered into an arrangement with City National whereby he agreed to sell some used automobiles that had been repossessed by the bank. Post sold the automobiles at the behest of City National and the sales occurred on Unique's sales lot. Unique and the Arnalls contend that sufficient evidence was presented at trial to show that these agreements between City National and Post had a number of detrimental effects for Unique's business and ultimately resulted in the termination of Post's employment with Unique.

The fundamental premise of tortious interference with contractual relations and the elements of a prima facie case were described by the Arkansas Supreme Court in *Mason v. Funderburk,* 247 Ark. 521, 446 S.W.2d 543 (1969):

"The fundamental premise of the tort—that a person has a right to pursue his valid contractual and business expectancies unmolested by the wrongful and officious intermeddling of a third party—has been crystallized and defined in Restatement, Torts § 766....

"The basic elements going into a prima facie establishment of the tort are (1) the existence of a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy on the part of the interferor; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted."

*Mason,* 446 S.W.2d at 547 (quoting *Calbom v. Knudtzon,* 65 Wash.2d 157, 396 P.2d 148 (1964)). No dispute exists regarding the first two elements: all parties agree that a valid contractual relationship existed between Unique and its employee, Stephen Post;[7] and City National concedes that it

---

7. The relationship between Unique and Post was apparently employment at will. There does not appear to be any mention in the record of an express agreement to the contrary. The Arkansas Supreme Court, in agreement with most jurisdictions, has held that employment terminable at will is an actionable contractual relationship. *Mason,* 446 S.W.2d at 546; *Prosser and*

**1316**

had knowledge of this employment relationship. The points of dispute, therefore, are the third and fourth elements.

 Although the district court spent considerable time receiving evidence on the appellants' counterclaim and considering City National's motion for a directed verdict, the exact rationale for granting the motion is not entirely clear from the transcript we have on appeal.[8] We hold, nonetheless, that the appellants failed to establish the third element of a prima facie case. That is, the appellants failed to produce sufficient evidence at trial from which a reasonable person could conclude that City National *intentionally* interfered with the employment contract between Unique and Post.[9]

The basic definition of intent for purposes of intentional torts in general is well

established. The Arkansas Supreme Court has "observed that intentional torts involve consequences which the actor believes are substantially certain to follow his actions." *Miller v. Ensco, Inc.,* 286 Ark. 458, 692 S.W.2d 615, 617 (1985). Although there are apparently no Arkansas cases defining "intent" within the context of tortious interference with contractual relations, the *Restatement (Second) of Torts* explains that the tort of interference with contractual relations is similar to other intentional torts "in the sense that the defendant must have either desired to bring about the harm to the plaitniff or have known that this result was substantially certain to be produced by his conduct." *Restatement (Second) of Torts* Ch. 37, at 5 (1977) (introductory note on the chapter for interference with contract or prospective contractual relation).

*Keeton on Torts* § 129 at 995–96 (5th ed. 1984); see also *Restatement (Second) of Torts* § 766 comment g (1977).

8. In the proper sequence of events, the party making the claim must establish a prima facie case and then the burden passes to the opposing party to show that its interference was justified. See *Stebbins & Roberts, Inc. v. Halsey,* 265 Ark. 903, 582 S.W.2d 266, 268 (1979). In an oral ruling on City National's motion, the district court judge stated:

> ... it seems to me that principally what the complaint is is that the bank lent money to someone that the Arnalls didn't want them to lend money to, and that's and that's [sic] something that banks do.
> It would certainly be a common law restraint of trade, one would think, for the bank to act otherwise than to lend money to someone who asked for it and who the bank is willing to lend money to, for whatever reason.

Trial Transcript, vol. II, at 246. Shortly after this statement—in response to the appellants' argument that the used car deal between City National and Post could not be characterized as a loan of money—the judge concluded, "I don't think this evidence would support a jury finding of tortious interference with an advantageous relation. Therefore, I'm going to grant the motion." *Id.* at 247.

The transcript suggests to us that the district court either granted City National's motion on the basis (1) that the act of loaning money to Post does not manifest an intent to interfere with Unique's employment contract with Post or (2) that the bank's actions were justified (i.e., that the loaning of money to borrowers by banks is a socially useful and lawful activity and, in fact, to not loan money might be unlaw-

ful). The appellants seem to draw the latter conclusion from the comments and argue on appeal that the district court erred because this affirmative defense was not set forth in City National's answer to their counterclaim "nor was any proof in the record offered on that point." Appellants' Brief at 44. Because we hold that the appellants failed to establish a prima facie case, there is no need to consider this argument.

9. Arkansas law at one time required, as an essential part of a case for intentional interference with contractual relations, that a plaintiff prove that the defendant acted with "malice" or an improper motive. See, e.g., *Elliott v. Elliott,* 252 Ark. 966, 482 S.W.2d 123, 128 (1972) ("Malice is also a necessary element of a cause of action for wrongful interference with the contractual rights and relationships of another."). This requirement, however, is no longer necessary. See, e.g., *Walt Bennett Ford v. Pulaski Cty. Spec. Sch. Dist.,* 274 Ark. 208, 624 S.W.2d 426, 429 (1981) (Supplemental Opinion on Petition for Rehearing) ("The general rule is that an improper motive or bad faith is no longer an essential part of the plaintiff's case in the tort of interference with existing contractual relations."). Despite the elimination of the requirement of malice, however, a plaintiff must still show that the defendant *intentionally* interfered with the contract. Justice Hays of the Arkansas Supreme Court observed in *Flynn v. McIlroy Bank & Trust Co.,* 287 Ark. 190, 697 S.W.2d 114 (1985), that "[i]t is true that the requirement of malice or spiteful intent has been relaxed, *Stebbins & Roberts, Inc. v. Halsey,* ... but an *intentional* interference remains a key element which the plaintiff must prove." *Flynn,* 697 S.W.2d at 117 (Hays, J., dissenting).

It is difficult to discern from the appellants' brief exactly what evidence of intent they believe was presented at trial; they make little attempt to delineate how intent was demonstrated or how it can be reasonably inferred from the evidence. The appellants, for example, contend that the financial agreements between City National and Post were made "in a manner that suggest[s] impropriety" because of Post's personal relationship with a bank officer. Reply Brief for Appellants at 7. Unique and the Arnalls do not point to any evidence to support their assertion of impropriety, but simply ask why, if it is not true, "Post so quickly default[ed] on the loans, forcing the bank to sue him too?" *Id.* A reasonable juror might infer from Post's default on his loans that those loans were somehow improper, but a reasonable juror could not further conclude from this that City National intended to interfere with the employment contract between Unique and Post.

Unique and the Arnalls also argue that they "presented testimony that while there had been no repossessions of mobile homes financed through [other creditors], there was a 60% to 70% default rate on financing through City National Bank after it had made an $86,000 loan to Mr. Post." Brief for Appellants at 39. The appellants apparently assert that the same loan officer who entered into the improper agreements with Post also acted in "concert with Post" to ensure that "potential defaulting customers" were placed with City National so as to put Unique out of business. Brief for Appellants at 42. No evidence was offered to support this claim.

Unique and the Arnalls point to Henry Arnall's testimony, during which he stated that sometime after he learned of City National's $86,000 loan to Post (but before the arrangement involving the used automobiles) he told City National that its loan permitted Post to act as a competitor and constituted interference. The appellants do not elaborate in their brief on how this testimony relates to City National's "intent," but we do not believe any reasonable juror could conclude from this testimony

that City National intended to interfere by making the loan. Moreover, the $86,000 loan to Post was for the purpose of financing the purchase of a small mobile home park and four mobile homes (for subsequent sale or rent). The mobile home park was sold to Post *by the Arnalls*. No reasonable juror could conclude that City National's loan caused an interference in Unique's employment contract with Post when the very need for the loan arose, in part, to finance property sold to Post by the Arnalls.

All of the arguments by the appellants on this issue, including points not discussed here, fail to persuade us that reversal of the district court's decision is warranted. After repeated perusal of the evidence regarding City National's financial agreements with Post we are convinced that there was no evidence presented at trial from which a reasonable juror could conclude that City National *intended* to interfere with the employment contract between the appellants and Post.

F. Attorney's Fees

■ City National set forth the damages it was requesting in Plaintiff's Exhibit 8. This account included an expense that totaled slightly more than $66,000 and appears to have been labeled in various places throughout the damages computation as "Legal Exp," "Legal/Repo," and "Expenses." In January 1990, a few months after the trial and judgment, the district court issued an order awarding City National attorney's fees in the amount of $50,-499. Unique and the Arnalls claim that this was an error: "the matter of attorney's fees was presented to the jury [in Exhibit 8] and was necessarily merged into their final verdict of $710,000," and the district court, in effect, awarded attorney's fees "twice for the same action" by its Order in January 1990. Brief for Appellants at 47–48. The appellants contend, moreover, that this error "serves to further establish that Exhibit 8 was contradictory and confusing." *Id.* at 47. We disagree,

for reasons which should be clear to the appellants upon closer review of the record and the documents involved in this case.

In the present case, two sorts of attorney's fees were incurred by City National: those involved in City National's attempts to collect its debt from customers, Unique, and the Arnalls before the lawsuit was commenced and those involved in the preparation and trial of this lawsuit. The former were included in City National's account of damages in Exhibit 8. The latter were awarded by the district court in its January 1990 Order. Although City National was apparently not consistent in how it labeled these expenses in Exhibit 8, testimony at trial by the senior vice-president of the bank described the expenses in some detail. *See* Trial Transcript, vol. I, at 96–99. The district court's written judgment and subsequent order also reveal that the damages awarded at trial did not include attorney's fees incurred by City National for the preparation and trial of this case. The district court expressly stated that it was retaining jurisdiction of the matter of attorney's fees for purposes of conducting a subsequent hearing. The matter of attorney's fees relating to the trial was thus eventually settled by the district court in its January 1990 Order.

### III. CONCLUSION

We have considered the other arguments put forth by Unique and the Arnalls and consider them to be without merit. For the reasons stated above the judgment is affirmed.